**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JULIE CYPROW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-3045 |
| | § | |
| | § | |
| TEXAS DEPARTMENT OF PUBLIC | § | |
| SAFETY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this employment discrimination suit, Julie Cyprow sues her former employer, the Texas

Department of Public Safety (TDPS), and supervisors, Cesar Torres and Norma Garza-Jennings.

Cyprow, a 61 year-old Caucasian woman, alleges that her employment was terminated because of

discrimination based on her race, sex, and age. She alleges violations of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. §§ 1983 and 1981, and the Age Discrimination

in Employment Act of 1967, 29 U.S.C. § 623 ("ADEA"). Cyprow also alleges retaliation, in

violation of Title VII and the ADEA, as well as civil conspiracy under Texas law. (Docket Entry

No. 1). Cyprow asserts that she was treated and disciplined differently than Hispanic and African-

American employees of the TDPS and that the defendants intentionally promoted minority

employees instead of her.

The defendants have moved for summary judgment. (Docket Entry No. 21). The defendants

assert that Eleventh Amendment immunity precludes Cyprow's claims except for the Title VII

discrimination and retaliation claims.  The defendants assert that Cyprow was terminated based on a history of poor customer service, customer and coworker complaints, progressive discipline, and the failure to improve after being given multiple opportunities to do so.  The defendants argue that Cyprow has failed to make a *prima facie* showing of discrimination because there is no evidence that she was replaced by someone outside the protected class and there is no evidence that other similarly situated employees were treated more favorably.  (*Id.*).  Cyprow responded, (Docket Entry No. 24), and filed a supplemental response, (Docket Entry No. 25).  Cyprow asserts that there are disputed fact issues material to determining whether the reasons for the discipline she received, the promotions she was denied, and her job termination, precluding summary judgment.

Based on a careful review of the pleadings, the motion and responses, the record, and the applicable law, this court grants the defendants' motion for summary judgment.  The reasons are explained in detail below.

## I.    Background

Cyprow began working for the TDPS on May 16, 2000.  She began as a driver's license technician in the South Gessner Driver License Office in Houston, Texas.  The Gessner Office is the busiest driver's license office in the state of Texas.  A large percentage of its customers are ethnic minorities, many of whom do not speak English.  Cyprow was responsible for staffing the application counters and helping customers with the application process, which required constant customer interaction.  Sergeant Scott Schillingburg was Cyprow's direct supervisor when she began working at the Gessner Office.

During Cyprow's first six months with TDPS, Schillingburg completed a performance observation, a mid-term assessment, and a performance observation.  In a document dated June 27,

2

2001, Schillingburg observed that "[t]he morning crowd was handled very effectively," that "[t]he ID policy was followed and explained accurately," and that "[o]verall performance observed met expectations." (Docket Entry No. 24, Ex. B-1). Schillingburg instructed Cyprow to "[r]emember to answer and give instructions in a way that reflects positively on the Department." (*Id.*). Schillingburg completed a mid-term assessment dated July 19, 2001. He concluded that Cyprow was "currently meeting these goals that were stated on [her] previous evaluation, accurate accountability in money transactions, accurate weekly reports, working well with coworkers, and the improvement of work attitude in order to provide quality customer service." (Docket Entry No. 24, Ex. B-2). On December 6, 2001, Schillingburg completed an observation of Cyprow's performance. The document stated: "Assisted with pulling files for customers in need of road tests. Customers processed were greeted professionally. Vision exams were conducted properly. Applications were checked and completed properly. Remember applicants meeting our ID policy are entitled to apply for a Texas DL or ID. Speak clearly when trying to communicate with customers not familiar with English." (*Id.*, Ex. B-3).

On December 28, 2001, a driver's license applicant named Fatemeh Nazeriam complained of rude and unprofessional behavior by Cyprow, including racially offensive remarks. (Docket Entry No. 21, Ex. D-2). Nazeriam complained that Cyprow questioned her legal status and told Nazeriam and her brother to go back to their country if they couldn't speak English. (Docket Entry No. 24, Ex. B, at ¶ 16). The conversation was witnessed and verified by Gail Johnson, another driver's license technician. (Docket Entry No. 21, Ex. F, at 280). Cyprow denies making any such remarks. (Docket Entry No. 24, Ex. B, at ¶ 16).

On February 27, 2002, a Gessner Office employee named Samantha Wharton complained

3

that Cyprow was rude and unprofessional toward her.  Wharton complained that Cyprow had thrown some paperwork on Wharton's desk, almost hitting her in the eye.  (Docket Entry No. 21, Ex. F, at 136).  Cyprow denies having thrown paperwork at Wharton.  (*Id.*, at 321).  Cyprow asserts that Wharton was being rude and hostile as they discussed scheduling, and that after Wharton threw the appointment sheets at her, Cyprow threw them back onto the work station next to Wharton.  (*Id.*).

Based on Fatemeh Nazeriam's December 28, 2001 customer complaint, Sergeant Schillingburg initiated a personnel complaint against Cyprow in early 2002.  The Driver License Division Chief sustained the complaint on March 26, 2002, finding that Cyprow's conduct violated TDPS rules on professional conduct.  (Docket Entry No. 21, Ex. D-2).  Cyprow received a written reprimand.  On April 4, 2002, Cyprow initiated an appeal of that disciplinary decision.  She discontinued that appeal on April 30.  (Docket Entry No. 21, Ex. D-1, at 46).

Schillingburg completed another performance observation of Cyprow on May 8, 2002.  It stated as follows: "Customers were provided good service.  Proper grading codes were utilized. Customers were placed on proper testing machines with correct tests.  Files were maintained properly.  Overall performance observed is meeting expectations."  (Docket Entry No. 24, Ex. B-5).

On May 14, 2002, Cyprow and TDPS Trooper Sharon Smith had a verbal disagreement.  The summary judgment evidence shows that Cyprow returned from an off campus lunch at 12:55 p.m and entered the break room before heading back to her station.  Cyprow's scheduled lunch break was from 12:00 p.m. to 1:00 p.m.  Trooper Smith told Cyprow that she had seen her leave for lunch ten minutes early and that Cyprow needed to get back to her station immediately.  Cyprow returned to her station.  Cyprow asserts that she had gone to her car at 11:45 a.m. to retrieve something, returned less than two minutes later, and then left for lunch at 12:00 p.m.  Later that day, Trooper Smith was

4

scheduled to count the cash in Cyprow's bank bag before Cyprow could leave work.  Because

Trooper Smith was not there on time, Trooper Valerie Glasco helped count the cash, but she called

Trooper Smith and said that she needed to be there to count bank bags.  When Trooper Smith arrived

at 4:15 p.m., Trooper Glasco asked her why she had not been at the office.  Trooper Smith responded

that if anyone had complained, "too bad, they will get over it."  Cyprow filed a written complaint

with Sergeant Schillingburg, stating that Trooper Smith's attitude and treatment toward her were

"uncalled for" and "racist."  (Docket Entry No. 24, Ex. B-6).  Cyprow asserted that Trooper Smith

had instructed a customer in Cyprow's line to go to another station because Cyprow was racist.

(Docket Entry No. 24, Ex. B-6).

On June 20, 2002, a customer named Xenos Yuen complained about Cyprow's customer

service.  Cyprow had told Yuen that she could not help him because she needed to leave the office

immediately, but then she proceeded to help two other customers.  (Docket Entry No. 21, Ex. D-1,

at 54).  On September 23, 2002, a customer complained that Cyprow had treated her rudely.  The

customer had requested an address change for her instructional permit.  Cyprow insisted that the

customer had to pass a skills test first.  The situation escalated and a driver's license examiner,

Ruthie Oliver, stepped in and helped the customer with the address change on the permit.  As

Cyprow returned to her nearby work station, Oliver heard her say, "I don't know why they issue

those damn things anyway."  (Docket Entry No. 21, Ex. F, at 140).  According to Oliver, Cyprow

continued to make comments to her and the customer.  (*Id.*).  The customer complained to Oliver's

supervisor, Sergeant Reyes, and Oliver reported the matter to Cyprow's new supervisor, Sergeant

Joe Marino.  (*Id.*).

On September 30, 2002, an unidentified customer called and left a message with the Chief's

Office to complain that Cyprow was extremely rude.  The customer said that Cyprow lacked customer service skills and did not work well with the public.  (Docket Entry No. 21, Ex. F, at 141).

On October 4, 2002, Cyprow formally requested a transfer from the Gessner Office because of "conflicting personalities."  (Docket Entry No. 24, Ex. B-7).  On October 8, 2002, Cyprow had been counseled by Sergeant Marino for the three recent customer service complaints.  (Docket Entry No. 21, Ex. D, at 46).  Sergeant Marino denied Cyprow's transfer request on October 18, 2002. (Docket Entry No. 24, Ex. B-7).  He stated that Cyprow had "been verbally counseled on several occasions regarding complaints from the public" and had also received a "written counseling regarding her demeanor towards the public which she blames the public actions rather than her own."  (*Id.*).  Sergeant Marino felt that Cyprow asked for the transfer because she did not want to work for him.  Instead, she wanted to work for Sergeant Reyes, who had been a supervisor at the Gessner Office and moved to a different location.  (*Id.*).  On the same date, October 18, Sergeant Marino and Sergeant Lewis denied Cyprow's request for a schedule change that she and another employee had arranged between them.  (Docket Entry No. 24, Ex. B-8).  The denial stated, "No, we don't have set schedules for this office."  (*Id.*).

Sergeant Schillingburg completed another performance observation for Cyprow on December 23, 2002.  This observation stated: "Worked the renewal side of office.  Was able to answer customer questions without assistance. Was polite towards applicants. Remind customers of proper exits."  (Docket Entry No. 24, Ex. B-9).  Schillingburg rated Cyprow's person-to-person customer service skills and overall performance as "Meets Expectations." (*Id.*).

On February 12, 2003, Sergeant Marino completed a performance evaluation report for Cyprow for the period ending December 31, 2002.  (Docket Entry No. 24, Ex. B-10).  Marino rated

her performance as meeting expectations for all categories except quality of work, which exceeded expectations, and public contacts, which needed improvement. (*Id.*). Specifically, Sergeant Marino stated that Cyprow exceeded expectations for money handling, with one error per 2,617 receipts, and that Cyprow had strengthened her working relationships with coworkers and had volunteered to work late several times. Sergeant Marino noted that he had "[r]eceived several complaints regarding your demeanor towards the public. There was no improvement since the Mid-Term in customer service skills." (*Id.*). Sergeant Marino set goals for Cyprow to meet during the next evaluation period, including: "Maintain a professional customer service attitude at all times when in contact with the public. Refrain from making unnecessary remarks to customers, do not get hooked into responding to negative feedback by customers." (*Id.*).

On February 27, 2003, Cyprow told Corporal Juarez, an office manager, that she needed to leave the office at 8:30 a.m. for one hour to meet a plumber at her house. Corporal Juarez gave Cyprow permission to leave. When Cyprow returned, Corporal Juarez was leaving Sergeant Marino's office and told Cyprow that Sergeant Marino wanted to speak to her. Sergeant Marino reprimanded Cyprow for leaving the building without proper authority. Cyprow responded that she had sought and received Corporal Juarez's permission to leave and she did not understand why he would deny it. After this meeting, Cyprow wrote an interoffice memorandum addressed to Sergeant Marino and his superiors, Lieutenant Blunt and Captain Fallis. Cyprow stated that she was thinking about filing a discrimination charge against Corporal Juarez. (Docket Entry No. 24, Ex. B-11).

During her employment with TDPS, Cyprow asked her superiors on several occasions why she was not promoted to the examiner position. (Docket Entry No. 21, Ex. D-1, at 57). The supervisors in Cyprow's chain of command told her that she had not received the promotion because

of her job performance.  (*Id.*).  On April 11, 2003, Chief Gloria wrote Cyprow to inform her that he agreed with her chain of command that Cyprow had been  denied promotions based on her performance.  (*Id.*).  Cyprow asked to meet with Sergeant Marino on April 22, 2003.  In the meeting, Cyprow asked Sergeant Marino why she had not been promoted to the Technician II rank.  Cyprow explained that she thought promotion to that rank was automatic after three years and had nothing to do with performance.  (*Id.*).

On August 6, 2003, Sergeant Debrow, who is African-American, told Cyprow that she was not carrying her share of the work load.  Sergeant Debrow said that she was spending too much time with each customer and that she was on the verge of being "weeded out" for not doing enough work. The next day, August 7, Cyprow was scheduled to leave work at 1:00 p.m.  She told Trooper Kent that her ride was coming to pick her up at 12:30 p.m.  Sergeant Debrow overheard this statement and told Cyprow that no one had given her permission to leave early and that she could not leave until 1:00 p.m.  According to Cyprow, Sergeant Debrow said that she was cheating on her timesheets and forcing other employees to trade shifts with her, and that the office did not need employees like her. Sergeant Debrow gave Cyprow a written counseling for failing to obey instructions by trying to leave work early without approval.  On August 12, 2003, Cyprow submitted a grievance to Sergeant Marino about her two encounters with Sergeant Debrow.  (Docket Entry No. 24, Ex. B-12).  Cyprow told Sergeant Marino that she would not go into Sergeant Debrow's office alone because he had a temper and could lose control and "hurt someone."  (*Id.*).

In late 2003 and early 2004, more customers complained about Cyprow.  On December 28, 2003, a customer wrote a letter to Trooper Kent to complain that Cyprow was "very rude and almost demeaning."  (Docket Entry No. 21, Ex. E, at 147).  The customer had brought her daughter to the

Gessner Office to obtain a driver's license and was in Cyprow's line.  Cyprow did not accept the customer's $20.00 bill and told the customer to go to a different station for change.  The technician at the other station also did not have change, but unlike Cyprow, she left her chair and went to another register to make change for the customer.  In the complaint, the customer asked that Cyprow receive a write-up for poor customer service and for speaking to her with a rude tone.  (*Id.*).  On January 30, 2004, a customer named Sam Ilyas complained to Sergeant Marcus Bolder and Sergeant Sharon Smith that Cyprow was rude to his friend, Imtiaz Khasru.  (Docket Entry No. 24, Ex. B-13). Ilyas had accompanied Khasru, who does not speak English, to the Gessner Office to help him apply for his driver's license.  Ilyas complained that Cyprow was rude, disrespectful, and impatient as Khasru attempted to complete the vision test.  According to Ilyas, Cyprow never gave Khasru a chance to complete the test.  Instead, Cyprow handed Khasru a form and told him it needed to be completed by an eye specialist before he could receive a driver's license.  Cyprow denies being rude or rushing Khasru through the vision test. (Docket Entry No. 24, Ex. B, at ¶ 27).  After Sergeants Bolder and Smith listened to the customer's complaints, they took Khasru to a different vision tester. She administered the test, which Khasru passed.  (Docket Entry No. 24, Ex. B-13).

In February 2004, Sergeant Cesar Torres became Cyprow's direct supervisor.  On February 5, 2004, Trooper Glasco saw Cyprow tell a child with a drink in her hand that she had to leave the building because food and drink were prohibited in the building.  (Docket Entry No. 24, Ex. B-14). Trooper Glasco told Cyprow to let the child keep the drink.  After the girl's guardian spoke to her in Spanish, the child walked away from the counter.  According to Trooper Glasco, Cyprow used a "rude and harsh" tone and said, "No! The drink needs to be out of the building." (*Id.*).  The child's guardian spoke to her again and the child put the drink in the trashcan.  When Trooper Glasco told

9

Cyprow that the drink was not a problem because it was covered with a lid, Cyprow responded, "The sign says no food or drink in the building." (*Id.*). Trooper Glasco described her observations in a memorandum to Sergeant Torres. (*Id.*). On February 9, 2004, Sergeant Torres verbally counseled Cyprow for violating General Order #2 by being discourteous to a customer. (Docket Entry No. 21, Ex. D-1, at 47). Two days later, on February 11, Cyprow was counseled for giving incorrect information to an applicant and for being rude and unprofessional to a customer. (Docket Entry No. 21, Ex. D-1, at 47). On February 25, 2004, Cyprow was counseled for refusing to give a customer change for a $100.00 bill. (*Id.*). Sergeant Torres checked Cyprow's drawer and determined that Cyprow had the money to make change for the customer, but had refused to do so. (*Id.*).

After Sergeant Torres became a supervisor at the Gessner Office, he cancelled all employee vacations, including previously granted vacation requests. He testified in his deposition that it was necessary to cancel the vacations because the office was busy and understaffed. (Docket Entry No. 25, Ex. C, Deposition of Cesar Torres, at 40:12–23). On March 5, 2004, Cyprow told Sergeant Torres that she had already purchased an airline ticket for her vacation. (Docket Entry No. 24, Ex. B, at ¶ 29). After consulting with his superiors, Sergeant Torres asked Cyprow to provide him with a copy of the airline ticket to verify that she bought it before the vacation policy changed. (Docket Entry No. 25, Ex. C, Deposition of Cesar Torres, at 40:24–42:6). Cyprow gave Sergeant Torres a copy of her plane ticket and Torres approved Cyprow's vacation time. (*Id.*). Although her vacation was approved, Cyprow asserts that Sergeant Torres singled her out by requiring a copy of her plane ticket and not returning it to her. (Docket Entry No. 24, Ex. B, at ¶ 29). Sergeant Torres testified in his deposition that he asked for a copy of Cyprow's itinerary because after he announced that vacations were cancelled, she was the only employee who said that she had booked a flight for a

vacation.  (Docket Entry No. 25, Ex. C, Deposition of Cesar Torres, at 43:25–44:12).  Sergeant Torres asserted that he returned the itinerary to Cyprow.  (*Id.*, at 43:8–9).

On March 22, 2004, Cyprow was again verbally counseled by Sergeant Torres based on a customer complaint from Mikdad Mormin, who stated that Cyprow was "rude, racist, and discourteous."  (Docket Entry No. 21, Ex. D-1, at 47).  On the same day, Cyprow refused to give a customer change for a $100.00 bill.  (Docket Entry No. 24, Ex. B-26).  The next day, March 23, one of Cyprow's coworkers told Sergeant Torres that Cyprow had taken something out of her register drawer and looked around as if to make sure no one was watching.  (Docket Entry No. 24, Ex. D-15).  On March 29, 2004, Cyprow was again counseled for the March 22 refusal to give a customer change.  (Docket Entry No. 21, Ex. D, at 47).

On May 5, 2004, two Gessner office employees complained to Sergeant Torres that Cyprow had made rude and racist remarks to them.  Dora Taylor, an African-American driver's license technician, reported that she had seen Cyprow skip over several minority applicants to help Caucasian applicants first.  (Docket Entry No. 21, Ex. D-5).  When Taylor brought this to Cyprow's attention, Cyprow called her a "black wench."  (*Id.*).  Urshula Jones, another African-American driver's license technician, complained to Sergeant Torres on May 5, 2004, that when she had tried to give Cyprow a hug in February 2004 – along with everyone else in the office – Cyprow said "Get off of me you big ape."  (Docket Entry No. 24, Ex. B-27).  Sergeant Torres forwarded these complaints to the Employee Relations Office on May 12, 2004.  (Docket Entry No. 21, Ex. D-3, at 67).

On May 7, 2004, Gerardo and Magnelly Ortega, driver's license applicants, complained that Cyprow had been rude to them on May 5, 2004.  (Docket Entry No. 21, Ex. F, at 152–58).  Gerardo

11

Ortega had filled out the application form except the spaces for a middle name and a suffix.  Cyprow told Ortega that the form needed to be completely filled out and instructed him to sit down and wait. Cyprow did not give the Ortegas a number for their place in line.  After Ortega asked Cyprow several times what more needed to be done on the form, Cyprow threw the clipboard at him.  Ortega complained that Cyprow's actions were based on the fact that he and his wife are Hispanic.  The Ortegas' written complaints noted that Cyprow attended to a Caucasian couple in her line without making them wait.  (*Id.*).

The TDPS initiated an investigation into the complaints against Cyprow on May 13, 2004. Judy Brown, Chief of the Driver License Division of TDPS, asked Garza-Jennings, Captain of the Houston Driver License Division, to investigate the allegations of unprofessional conduct and racial discrimination by Cyprow.  (Docket Entry No. 21, Ex. D-3, at 66).  Captain Garza-Jennings was instructed to investigate the allegations that Cyprow served Caucasian customers before minority customers and had used "racist or inappropriate language towards black Department employees." (*Id.*).  Kevin Casey, an Employee Relations Officer, stated that if these allegations were true, Cyprow's actions violated the TDPS rules that prohibit "unprofessional conduct" and use of the "Department's authority to subject members of the public to decisions based on . . . race, color, [or] national origin. . . ." (*Id.*).  Casey's recommendation to investigate Cyprow for a violation of these rules was also based on Cyprow's "substantial history of complaints from minority members of the public regarding her treatment of them."  (*Id.*).

On May 14, 2004, Lieutenant Blunt, head of the Gessner Office, received a letter from Cyprow complaining about Sergeant Torres and his vacation policy.  In her May 11, 2004 letter, Cyprow informed Lieutenant Blunt that although Sergeant Torres had ultimately approved her

12

vacation because it was planned and paid for before the policy change, he had kept her flight information "which was [her] personal information" and "personal property." (Docket Entry No. 24, Ex. B-18).  Cyprow wanted to know why Sergeant Torres did not require an itinerary or flight information from any other Gessner Office employee. (*Id.*).  Cyprow also complained that Sergeant Torres had denied her request to take off July 2nd and July 5th as vacation days and she did not know why.  Cyprow said that no one else had been approved to have those days off, but that if Sergeant Torres ended up approving another employee's request to take vacation on either of those days, she would "more than likely turn this into a discrimination letter." (*Id.*).  Cyprow complained that this was not the first time Sergeant Torres had denied her requests for time off, even though she did not abuse her vacation time or sick time. (*Id.*).

Cyprow wrote Lieutenant Blunt another letter on May 17, 2004 to complain that she had been passed over for promotion eight times since working at the TDPS.  (Docket Entry No. 24, Ex. B-21).  She noted that the TDPS policy was that no employee who had received a written counseling in the past six months was eligible for the open examiner position.  Cyprow stated that her write-up for asking a customer for correct change was unwarranted.  Cyprow explained that when technicians "have to look for a trooper to ask for change, most of the time they are not to be found, or they are busy or they don't have a key." (Docket Entry No. 24, Ex. B-21).  Cyprow complained that Dora Taylor had recently asked a customer for correct change but did not receive a written counseling. Cyprow believed that the department was trying to prevent her from obtaining a promotion by writing her up for asking a customer for correct change.  Cyprow stated that there was no reason for her not to receive a promotion other than discrimination.  (Docket Entry No. 24, Ex. B-21).  The same day that she wrote this letter to Lieutenant Blunt, Cyprow also wrote Sergeant Torres a letter

13

outlining alleged discriminatory acts and practices against her at the Gessner Office.  (Docket Entry No. 24, Ex. B-22).

On May 18, 2004, Cyprow wrote Captain Garza-Jennings and Kevin Casey to complain that Captain Garza-Jennings had retaliated against her for complaining about discrimination by Sergeant Torres.  (Docket Entry No. 24, Ex. B-22).  Cyprow had given Sergeant Torres a letter complaining about his discriminatory acts at 9:00 a.m. the previous morning, May 17.  Captain Garza-Jennings called Cyprow to her office at 12:40 p.m. on May 17 to tell her that two employees, Taylor and Jones, had complained about racial remarks Cyprow made.  (*Id.*).  In her May 18 letter, Cyprow complained that Captain Garza-Jennings did not tell Sergeant Torres about Cyprow's complaints toward him.  Cyprow stated that the allegations by Taylor and Jones were "false and in direct retaliation for my complaints of discrimination."  (Docket Entry No. 24, Ex. B-22).  Cyprow noted that Jones's complaint was based on an alleged comment made three months earlier and stated that it was "clear that Capt. Jennings is retaliating against me based on my complaints of discrimination." (*Id.*).  Cyprow believed that the fact that Captain Garza-Jennings intended to investigate the complaints against her of discriminatory animus while ignoring her own complaints of discrimination by Sergeant Torres "further establishe[d] the discrimination for which [she] previously complained about."  (*Id.*).  Captain Garza-Jennings referred Cyprow's May 18 letter to Kevin Casey, who forwarded it to the Equal Employment Opportunity Officer at the TDPS.  One week later, on May 25, 2004, the EEO Officer wrote Cyprow and stated that her retaliation allegation was baseless because the investigation into Cyprow's racial remarks and rude behavior to the public was assigned to Captain Garza-Jennings on May 13, four days before Cyprow's letter to Sergeant Torres complaining of discrimination.  (Docket Entry No. 24, Ex. B-25).  The EEO

Officer assured Cyprow that the investigation would be thorough and complete and would be subject to review by "Internal Affairs, the Office of General Counsel, my office, and the Employee Relations Office prior to the report being submitted to the division chief." (*Id.*).

On June 21, 2004, Cyprow was counseled a third time for refusing to give a customer change for a $100.00 bill. (Docket Entry No. 21, Ex. D-1, at 48). On June 24, 2004, Cyprow had filed a charge of discrimination with the EEOC. (Docket Entry No. 24, Ex. B-36). She alleged that she was the victim of discrimination and retaliation because she applied eight times for a promotion in the Examiner Department but was passed over in favor of minorities and younger individuals each time. She complained that the TDPS did nothing when she brought this evidence of discrimination to the attention of her supervisors, including Sergeant Torres. Cyprow alleged that Captain Garza-Jennings was retaliating against her for complaining about discrimination in promotions. Cyprow further alleged that the TDPS was "conducting a crusade against [her] in an attempt to terminate [her] based on [her] claims of discrimination." (*Id.*) On July 1, Cyprow was counseled for refusing to assist a customer who needed to change the address on her driver's license. (Docket Entry No. 21, Ex. D-1, at 48).

The TDPS sustained the complaints against Cyprow on July 8, 2004. (Docket Entry No. 24, Ex. B-27). All the allegations against her that Captain Garza-Jennings investigated were sustained. Judy Brown, Driver License Division Chief, determined that Cyprow had violated TDPS policies prohibiting sexual harassment, discrimination, and unprofessional conduct. Cyprow was suspended for two days without pay and placed on disciplinary probation for six months. (*Id.*). Cyprow appealed this determination. (Docket Entry No. 21, Ex. D-6, at 78). A disciplinary hearing was held on July 27, 2004. (*Id.*, at 79). On August 9, 2004, Judy Brown reduced Cyprow's disciplinary

15

action to one day off without pay but retained the six-month disciplinary probation. (*Id.*). Cyprow appealed this decision to Colonel Thomas Davis, Director of TDPS on August 13, 2004. (Docket Entry No. 21, Ex. D-6, at 88). Davis took the appeal under advisement.

On August 19, 2004, Cyprow filed an Employee Relations complaint, alleging that Sergeants Pulley and Torres discriminated against her on the basis of race. (Docket Entry No. 21, Ex. F, at 113). Lieutenant Schillingburg investigated these allegations and determined that they lacked merit, finding that Sergeants Pulley and Torres were merely holding Cyprow accountable for her actions, not discriminating against her. (*Id.*). Judy Brown upheld Schillingburg's decision on September 16, 2004. (Docket Entry No. 21, Ex. D-1, at 59).

On October 7, 2004, a customer complained that Cyprow had been rude and had told her to go to another station for help. (Docket Entry No. 21, Ex. F, at 161). On October 11, 2004, several driver's license technicians complained that Cyprow was rude, loud, and unprofessional to the first customer who came through the door that morning. The customer had attempted to duck under the ropes that form the customer line. Cyprow yelled, "The reason they are made that way sir is for you to walk around, go back." (Docket Entry No. 21, Ex. F, at 164). Cyprow's coworkers said that the other customers in the office looked on in disbelief that a government employee would yell at a customer in that fashion. (*Id.*).

On October 19, 2004, Colonel Davis affirmed Brown's decision to discipline Cyprow with one day off without pay and six months of disciplinary probation. (Docket Entry No. 21, Ex. F, at 296). Cyprow's probation began on November 1, 2004. She had to comply with specific terms and conditions, including: (1) attending a sexual harassment/discrimination training class; (2) refraining from any conduct that could be considered a violation of TDPS's policy on sexual harassment and

discrimination; (3) writing an apology letter to Taylor and Jones; (4) spending two hours per week reviewing a customer service relations book and submitting weekly reports to Sergeant Torres on what she learned; (4) treating her coworkers and customers with respect; and (5) following all departmental policies. (Docket Entry No. 21, Ex. D-6, at 81–82). Cyprow's probation was scheduled to end on April 30, 2005.

Cyprow called in sick on November 9, 2004. TDPS policy required her to call her direct supervisor, Sergeant Torres. Cyprow called the office at 7:00 a.m. and spoke with Trooper LaShae Burns. (Docket Entry No. 21, Ex. F, at 346). Cyprow told Trooper Burns, "I don't believe I'm going to make it in today." Burns told Cyprow to call her supervisor; Cyprow responded that she would page Sergeant Torres. (*Id.*). According to Trooper Burns, Cyprow did not say whether she was feeling ill, but Burns assumed that was why she was not coming to work. Burns expressed hope that Cyprow felt better. (*Id.*). Cyprow asserts that she paged Sergeant Torres three times but that his pager was not working. (*Id.*, at 348). Cyprow wrote a letter to Sergeant Torres accusing Trooper Burns of lying because she said Cyprow did not cite illness as the reason she would not be at work. (*Id.*). Cyprow stated: "I resent the fact that [Trooper Burns] is sworn to uphold the law, but yet she will lie against her fellow employee for no good reason. If she has lied about someone calling in sick, what else has she lied about. I would be afraid to ask Trooper Burns for any help at work, knowing that she would lie if some problem ever came up." (*Id.*). Cyprow called for an investigation into Trooper Burns and demanded an apology. (*Id.*). Trooper Burns denied Cyprow's allegations. She stated that she had told Cyprow, "I hope you feel better," because she assumed that Cyprow could not make it to work because she was sick. (Docket Entry No. 21, Ex. F, at 346). Cyprow's time records for November 9, 2004 show that she used sick time for taking the day off.

(Docket Entry No. 21, Ex. D-7, at 86).  Based on Cyprow's failure to notify Sergeant Torres that she would not be at work, Cyprow received a written counseling on November 18, 2004.  The counseling was for violating General Order #4, which requires an employee "[t]o know and obey orders and instructions at all times."  (*Id.*).

On December 1, 2004, Captain Garza-Jennings recommended that the TDPS terminate Cyprow's employment for receiving a written counseling and for failing to comply with her probation terms.  (*Id.*).  Captain Garza-Jennings believed that Cyprow was still refusing to accept responsibility for any of her actions.  She pointed to Cyprow's first weekly report to Sergeant Torres, which "again placed blame on supervision for what she believes is them always taking the customers['] side."  (*Id.*).  Captain Garza-Jennings also  believed that Cyprow had not taken the apology to Dora Taylor seriously.  The apology was required under Cyprow's probation terms.  Cyprow's letter to Taylor stated: "I apologize for my unprofessional comment that you claim I made."  (*Id.*, at 87).  Captain Garza-Jennings recommended that the TDPS terminate Cyprow's employment because she had failed to take the disciplinary action seriously and had violated one of the probation terms within nine days after probation began.  (*Id.*).  Major Lawrence Cuny, Driver License Division, determined on December 10, 2004 that it was too early to request termination because Cyprow was only in her fifth week of a six-month probation period and the violations noted by Captain Garza-Jennings were not sufficiently clear or severe to warrant termination.  (Docket Entry No. 21, Ex. F, at 304).

In late 2004, Deandra Carlisle, a driver's license technician, complained that Cyprow was scrutinizing everything that she did to help customers with special needs.  (Docket Entry No. 21, Ex. F, at 269).  Cyprow claimed that Carlisle was only helping African-American customers.  (*Id.*).

18

On March 10, 2005, Cyprow filed a formal complaint against Carlisle, alleging that Carlisle's complaint against her was retaliation for saying that Carlisle only helped African-Americans. (Docket Entry No. 21, Ex. D-1, at 59; Ex. F, at 315).  On March 11, 2005, Cyprow alleged that six examiners at the Gessner Office who had reported her for not properly filing test paperwork were discriminating against her by making those reports.  (Docket Entry No. 21, Ex. D-1, at 59). Lieutenant Blunt investigated the complaints against Carlisle and the six examiners and determined that Cyprow's allegations lacked merit.  (Docket Entry No. 21, Ex. F, at 316).

In early 2005, the TDPS continued to receive complaints about Cyprow from customers and employees.  On February 4, 2005, customer Wendell Hart complained that Cyprow told him in a harsh tone that it was too late to be helped and that he would have to return the next day.  (Docket Entry No. 21, Ex. D-1, at 56).  Hart noted that he had arrived at 4:45 p.m. and that the office did not close until 5:00 p.m.  (Docket Entry No. 21, Ex. F, at 166).  On March 10, 2005, another customer complained that Cyprow was rude and discourteous with him.  (*Id.*, at 167).  On March 22, 2005, another customer, Jason Black, informed TDPS that he witnessed Cyprow being "extremely rude and unprofessional to a Hispanic man ahead of him in line."  (Docket Entry No. 21, Ex. D-1, at 56). On March 28, 2005, examiner Ruthie Oliver complained that Cyprow was harassing her by leaving her workstation and coming to the examiners' room to see what the examiners were doing.  (Docket Entry No. 21, Ex. F, at 169).  Oliver complained that Cyprow stood by the time clock and monitored when examiners clocked in and out.  (*Id.*).  On April 29, 2005, two other coworkers complained that Cyprow was rude and unprofessional.  Krystal Link, a new employee working at the information desk, complained that on April 4 or 5, Cyprow had yelled at her for allowing a handicapped couple to walk up to Cyprow's workstation without waiting in line.  (Docket Entry No. 21, Ex. F, at 171).

Link complained that Cyprow was rude and unprofessional and told her that *everyone* had to take a number, handicapped or not.  (*Id.*).  Magdalene Bailey, another new employee working at the information desk, complained that on April 7 or 8, Cyprow had yelled at her about a missing form. (Docket Entry No. 21, Ex. F, at 170).

Based on Cyprow's performance and continued complaints from customers and  her coworkers during the six-month probation period, Sergeant Torres recommended to Judy Brown that the TDPS either terminate Cyprow's employment or place her on additional disciplinary probation. (Docket Entry No. 21, Ex. F, at 112–14).  On July 6, 2005, Brown decided to institute another six-month probation period, with another set of probation terms.  (*Id.*, at 93–95).  Cyprow was required to treat coworkers and public contacts with courtesy, tact, patience, and discretion; abide by all departmental policies and the department's ten general orders; and focus on following four specifically identified general orders.  (*Id.*).  The extended probation period was from August 1, 2005 to January 31, 2006.  (*Id.*).

Cyprow received seven customer complaints for rude and unprofessional behavior during her extended probation period.  She continued to apply for promotions but was not selected for these positions.  She did not score well on her interviews and her superiors believed that she had poor customer service skills.  (Docket Entry No. 21, Ex. A, at 13, Deposition of Julie Cyprow, at 65:13–23).  In August 2005, a customer, Lorri Mbunta, complained that Cyprow skipped over her to help another customer.  When Mbunta finally reached Cyprow's station, Cyprow was rude and had no regard for her inquiries.  (Docket Entry No. 21, Ex. D-1, at 56).  Mbunta complained that Cyprow was prejudiced.  (Docket Entry No. 21, Ex. F, at 172–73).  On September 8, 2005, customer Erika Davis complained that Cyprow was rude, unprofessional, belittling, and did not help her at all.

20

(*Id.*, at 174).  On November 7, 2005, customer Toni Mack complained that Cyprow snatched the number from her hand and refused to give it back.  (Docket Entry No. 21, Ex. F, at 224).  Mack asked to be assisted by a supervisor because of Cyprow's rude and unprofessional behavior.  (*Id.*). On November 30, 2005, customer Chap-Bee Yap complained that after Cyprow displayed her number, she approached Cyprow's station but was rudely told that she needed to wait because Cyprow was not done with the previous customer.  (Docket Entry No. 21, Ex. F, at 227).  Yap responded that Cyprow should not have flashed her number if she was not ready for the next customer.  Cyprow replied that she could "flash whatever number she wanted at whatever time she wanted and that if [Yap] was not happy with that, [she] could complain to her supervisor."  (*Id.*). On December 16, 2005, customers Adrian Marquez and Aida Villanueva filed separate complaints that Cyprow was rude, raised her voice, and pointed her finger at them.  (Docket Entry No. 21, Ex. F, at 230–33).  On January 5, 2006, customer Heng Lim complained that after it took him a few attempts before he passed the written test, Cyprow told him that although he had passed the test, he did not learn anything.  (Docket Entry No. 21, Ex. F, at 236).  Lim was offended and hoped "that she will change her behavior with other people."  (*Id.*).  On January 5, 2006, Cyprow applied for an examiner's position at another Houston-area driver's license office.  (Docket Entry No. 24, Ex. B-31).  Her interview was scheduled for January 12 at 9:15 a.m.  (*Id.*).  Cyprow asserts that she was prepared to leave the Gessner Office with plenty of time before her interview, but Sergeant Torres told her to wait to give another interviewee a ride.  (Docket Entry No. 24, Ex. B, Affidavit of Julie Cyprow, at ¶ 51).  According to Cyprow, the other interviewee was late getting to the Gessner Office, which made Cyprow late to the 9:15 a.m. interview.  (*Id.*).  When Cyprow arrived at 9:32 a.m. and the supervisor told her she was late, Cyprow responded that she understood and said

21

"refuse me if you want to." (Docket Entry No. 24, Ex. B-32).  The supervisor informed Cyprow that the interview times were structured and that there would not be enough time for her to interview for the position.  (*Id.*).  Cyprow asserts that Sergeant Torres purposefully made her late for the interview.  (Docket Entry No. 24, Ex. B, Affidavit of Julie Cyprow, at ¶ 51).

Based on Cyprow's job performance and the seven customer complaints against her during the extended probation period, Lieutenant Blunt filed a personnel complaint against her on January 26, 2006.  (Docket Entry No. 21, Ex. F, at 200).  The complaint alleged that Cyprow had violated the terms of her disciplinary probation by being rude and discourteous to customers and by failing to follow department policies.  (*Id.*).  Sergeant Teresa Perkins-Lee investigated the complaint, interviewed several of the customers who had complained during the extended probation, and gave Cyprow an opportunity to rebut their statements.  (Docket Entry No. 21, Ex. F, at 204).  Based on her investigation, Sergeant Perkins-Lee submitted a report to Captain Garza-Jennings on February 28, 2006.  (*Id.*).  Perkins-Lee concluded that Cyprow "continue[d] to display a pattern of being rude and discourteous to the customers" and had failed "to heed the Department warnings about her behavior." (*Id.*, at 211).  Sergeant Perkins-Lee concluded that Cyprow's actions showed that the two probation periods had failed to correct her behavior toward customers, especially in serving minority customers.  (*Id.*).  Sergeant Perkins-Lee recommended that the TDPS terminate Cyprow's employment.  (*Id.*).

On May 26, 2006, Colonel Davis, Director of the TDPS, sustained the allegations of Lieutenant Blunt's complaint and followed the recommendations to terminate Cyprow's employment.  (Docket Entry No. 24, Ex. B-34).  Colonel Davis noted that Cyprow had a "pattern of discourteous and unprofessional behavior toward driver license customers and co-workers." (*Id.*).

Colonel Davis told Cyprow: "In sum, you have displayed a continuous pattern of unacceptable behavior and have indicated no intent to consistently modify such conduct despite repeated counseling by your supervisors and substandard ratings on your performance evaluation in the area of Public Contacts."  (*Id.*).   Colonel Davis told Cyprow that he had made a preliminary determination to terminate her employment but that she could present information and documentation to persuade him otherwise.  Cyprow and her attorney met with Colonel Davis on July 13, 2006.  (Docket Entry No. 21, Ex. D-12).  Colonel Davis considered the information presented at that meeting and decided that Cyprow had not rebutted the charges or given him a reason to alter the preliminary decision.  (*Id.*).  Cyprow's employment was officially terminated on July 19, 2006. (*Id.*).

Cyprow filed an EEOC charge of discrimination on January 24, 2007.  Cyprow alleged that she was terminated in retaliation for filing an internal discrimination claim against Sergeant Torres. She also alleged that she had been discriminated against on the basis of her race, sex, color, and age while working for the TDPS.   Cyprow filed this lawsuit on September 20, 2007, alleging discrimination and retaliation under Title VII, the ADEA, and 42 U.S.C. §§ 1981 and 1983, as well as a conspiracy claim under Texas law.  The defendants' motion for summary judgment followed extensive discovery.

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

III.    **The Immunity Defenses**

   A.    **Eleventh Amendment Immunity**

The TDPS argues that it is immune from Cyprow's claims under § 1981, § 1983, and the ADEA.  "The Eleventh Amendment prohibits a private citizen from bringing suit against a state in federal court unless the state consents."  *Daigle v. Gulf State Utilities Company, Local Union Number 2286, et al.*, 794 F.2d 974, 980 (5th Cir. 1986).  A suit against a state agency "is a suit against the state." *Id.*  A state's immunity from suit, however, is not absolute.  *Meyers v. Texas*, 410 F.3d 236, 241 (5th Cir.2005).  There are three exceptions to Eleventh Amendment immunity. Congress can abrogate Eleventh Amendment immunity without a state's consent when acting under its authority under the enforcement provisions under § 5 of the Fourteenth Amendment.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985).  Or a state "may waive its sovereign immunity by consenting to suit." *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, et al.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).  Waiver is present if the state voluntarily invokes federal-court jurisdiction or makes a clear declaration that it intends to submit itself to federal-court jurisdiction. *Meyers*, 410 F.3d at 241.  The third exception exists for suits seeking prospective injunctive relief against state employees in their official capacities.  A suit against an employee in his or her official capacity is a suit against the entity of which the official is an agent.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Under *Ex Parte Young*, 209 U.S. 123 (1908), the exception applies only if a suit alleging violations of federal law is "brought against individual persons in their official capacities as agents of the state, and the relief sought [is] declaratory or injunctive in nature and prospective in effect."  *Aguilar v. Texas Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998); *see also Brennan v. Stewart*, 834 F.2d 1248, 1253 (5th Cir.1988) ("The Eleventh Amendment and the doctrine of *Ex parte Young* together create a relatively simple rule of state immunity.  Basically,

prospective injunctive or declaratory relief against a state is permitted–whatever its financial side-effects–but retrospective relief in the form of a money judgment in compensation for past wrongs–no matter how small–is barred.").

In the present case, the TDPS is entitled to Eleventh Amendment immunity on Cyprow's claims for money damages under § 1981, § 1983, and the ADEA.  *See Lee v. Texas Dept. of Public Safety*, 2004 WL 2583782, at *1 (N.D. Tex. Nov. 10, 2004) (immunity from § 1983 claim).  TDPS is an agency of the State of Texas.  *See Taylor v. Seamans*, 640 F.Supp. 831, 833 (E.D. Tex 1986) (holding that TDPS is an arm of the State of Texas for Eleventh Amendment purposes).  The TDPS is part of the State's executive branch.  TEX. GOV'T CODE § 411.002.  Its duties are statewide, its funding is governed by legislative appropriations, and a judgment against the TDPS would be paid directly by the State.  *Id.* §§ 411.002, 411.013.  The State of Texas considers TDPS a "governmental unit" for purposes of its sovereign immunity analysis.  TEX. CIV. PRAC. & REM. CODE § 101.001(2)(A).  Congress has not abrogated Eleventh Amendment immunity for suits against State agencies, like the TDPS, under §§ 1981 and 1983.  *Hines v. Mississippi Dep't of Corrections*, 239 F.3d 366 (5th Cir. 2000).  Nor has Congress eliminated state sovereign immunity for suits by private individuals under the ADEA.  *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000).  Cyprow did not allege or argue that the TDPS has consented to be sued in federal court or that the TDPS waived its Eleventh Amendment immunity.  The Eleventh Amendment precludes Cyprow's claims for money damages against the TDPS under § 1981, § 1983, and the ADEA.

With respect to injunctive relief, Cyprow seeks an order of reinstatement to her previous position as a driver's license technician.  Reinstatement of employment is a form of prospective equitable relief that falls under *Ex parte Young*.  *See Nelson v. University of Texas at Dallas*, 535

26

F.3d 318, 322 (5th Cir. 2008).  Cyprow's claims for money damages against Torres and Garza-Jennings in their official capacities are barred by the Eleventh Amendment, but her claim for reinstatement under § 1981, § 1983, and the ADEA is cognizable under *Ex parte Young* because it is a claim for prospective relief.  *See id.*

Discrimination claims under Title VII, § 1981, and § 1983 are "parallel causes of action." *Lauderdale v. Tex. Dep't of Crim. Justice, Inst'l Div.*, 512 F.3d 157, 166 (5th Cir. 2007). "Accordingly, the 'inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII.'"  *Id.* (quoting *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)).  As explained below, Cyprow has failed to raise a fact issue material to determining whether she experienced discrimination or retaliation that violated Title VII.  Summary judgment is granted dismissing Cyprow's official-capacity claims against Torres and Garza-Jennings seeking reinstatement as a remedy for discrimination and retaliation in violation of § 1981 or § 1983; the claims fail as a matter of law.[1]  The merits of Cyprow's ADEA reinstatement claim against these defendants are examined below with her Title VII claims.

### B.    Qualified Immunity

Cyprow also sued Torres and Garza-Jennings in their individual capacities for violating §

---

[1]       Moreover, Cyprow failed to bring her § 1981 claim pursuant to § 1983, as required by the Fifth Circuit.  "[W]hen a state employee seeks to hold an individual fellow state employee liable for damages for violation of § 1981 rights, such claim must also be pursued through the remedial provision of § 1983." *Felton v. Polles*, 315 F.3d 470, 482 (5th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  "[R]equiring § 1981 claims against state actors to be pursued through § 1983 is not a mere pleading formality," but has other consequences, such as the fact that *respondeat superior* liability is available under § 1981, but not § 1983.  *Id.*  In the complaint, Cyprow alleged a separate cause of action for discrimination based on race in violation of § 1981.  Cyprow did not properly bring her § 1981 claim against Torres and Garza-Jennings through § 1983.

1981 or § 1983.[2]  The defendants assert qualified immunity.  Cyprow argues that qualified immunity

does not apply because Torres and Garza-Jennings "used their uniforms and badge aura to force or

solicit false statements and give them the rubber stamp of veracity as against Plaintiff."  (Docket

Entry No. 24, at 17).  Cyprow argues that she had a "protected liberty interest in her ability to earn

a livelihood" and was "deprived of that interest by the widespread labeling of being a racist by

Torres and his fellows."  (*Id.*).  Cyprow also argues that qualified immunity does not apply because

she was deprived of her right "to be free from adverse employment action based on false evidence."

(*Id.*).

"[G]overnment officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  Qualified immunity applies to state officials

sued for constitutional violations under § 1983.  *See id.* at n. 30 (citation omitted); *see also Palmer

v. Johnson*, 193 F.3d 346, 351 (5th Cir.1999).  "The Supreme Court has characterized the doctrine

---

[2]     To the extent that Cyprow has sued Torres and Garza-Jennings for violating Title VII or the ADEA, her claims fail as a matter of law because these individuals were not Cyprow's employer.  The ADEA defines an employer as "a person engaged in industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  29 U.S.C. § 630(b).  "The ADEA 'provides no basis for individual liability for supervisory employees.'" *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 686 (5th Cir. 2001) (quoting *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996)).  Under Title VII, an "employer" may not discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2.  An "employer" includes any "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks . . . ."  *Id.* § 2000e(b).  Fifth Circuit law is clear "that the term 'employer' does not include a hiring or supervisory official in his personal or individual capacity."  *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998) (citing *Grant v. Lone Star Co.*, 21 F.3d 649, 652-53 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994)); *see also Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 340 (5th Cir. 2003).  Summary judgment is granted as to Cyprow's Title VII and ADEA claims against Torres and Garza-Jennings.

as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).  When a public official claims qualified immunity, the court must address two issues: (1) whether the plaintiff has made a sufficient showing that the official violated a "clearly established" right; and (2) if so, whether the official's actions were "objectively reasonable in light of the clearly established right." *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 337 (5th Cir. 2003) (citing *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)).  The Supreme Court recently concluded that the specific order of the qualified immunity inquiry is not required and held that "judges of the district court and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct.  808, 818 (2009).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white[3] citizens."  42 U.S.C. § 1981(a).  The protections against race discrimination "include[ ] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b); *see Felton v. Polles*, 315 F.3d 470, 483 (5th Cir. 2002) (citing § 1981) (other citations omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  Section 1983 provides:

---

[3]  Despite its language, § 1981 prohibits racial discrimination against Caucasians as well as persons of other races.  *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 287-96, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (1996).

The record shows no violation of a clearly established right, as a matter of law. The Fifth Circuit has held that "[n]either harm to reputation nor the consequent impairment of future employment opportunities are constitutionally cognizable injuries." *Vander Zee v. Reno*, 73 F.3d 1365, 1369 (5th Cir. 1996). Cyprow's allegations that being labeled a racist damaged her reputation or impaired her future employment prospects, standing alone, fail to state a claim of denial of a constitutional right.

Cyprow's allegations that she was deprived of her ability to earn a livelihood based on false evidence are analyzed under a seven-element "stigma-plus-infringement" test used to determine whether § 1983 affords a government employee a remedy for deprivation of liberty without notice or an opportunity to clear her name. *See Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000). The elements of the test are that: (1) the plaintiff was discharged; (2) stigmatizing charges were made against her in connection with the discharge; (3) the charges were false; (4) she was not provided notice or an opportunity to be heard before the discharge; (5) the charges were made public; (6) she requested a hearing to clear her name; and (7) the employer denied the request. *Id.*

The undisputed evidence in the record shows that Cyprow was provided an opportunity to be heard before the termination went into effect. Colonel Davis made a preliminary determination

to terminate Cyprow's employment but gave her the opportunity to come forward with evidence or arguments as to why that decision should be changed.  Even assuming that Cyprow met the first five elements of this test, the evidence in the record does not show that Cyprow requested a public hearing or that the TDPS denied such a request.  The private meeting Cyprow and her attorney had with Colonel Davis is insufficient to satisfy the sixth prong of the stigma-plus-infringement test. *See Bledsoe v. City of Horn Lake*, *Miss.*, 449 F.3d 650, 653–54 (5th Cir. 2006) (holding that a terminated public employee who requested a meeting with the decisionmakers, but did not request a meeting to clear his name in a public forum, failed to request a name-clearing hearing under the stigma-plus-infringement test as a matter of law).

Because there is no evidence that a clearly established right was violated, and because this court grants summary judgment dismissing Cyprow's discrimination claims, qualified immunity applies to the actions of the individual defendants.  In the absence of evidence that would permit a reasonable jury to find that these defendants committed a constitutional violation, Torres and Garza-Jennings are entitled to qualified immunity.

## IV.     The Discrimination Claims

Cyprow, a 61 year-old Caucasian woman, alleged that the TDPS discriminated against her based on race, color, age, and sex because she was treated differently than younger, male, and African-American and Hispanic employees.  In the complaint, Cyprow alleged that she was passed over for promotions because of her race, color, age, and sex.  Cyprow also alleged disparate treatment because she was terminated from her position while younger, male, and minority employees were not.

### A.     The Legal Standard

31

Title VII prohibits discrimination by employers "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ."  42 U.S.C. § 2000e-2(a).  Intentional discrimination can be proven by either direct or circumstantial evidence.  *Burrell v. Dr. Pepper/Seven Up Bottling Group*, *Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  Evidence is "direct" if it would prove the fact in question without inference or presumption.  *Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citations omitted).  If no direct evidence exists, the court uses the familiar burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under *McDonnell Douglas,* a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) others similarly situated were treated more favorably.  *See id.*; *Strong v. Univ. Healthcare System*, *L.L.C.*, 482 F.3d 802, 805–06 (5th Cir. 2007).  If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged action.  *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.  If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision.  *See Burrell*, 482 F.3d at 411–12 (citations omitted).  The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination."  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005).  The United States Supreme

32

Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  530 U.S. 133, 143 (2000). A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence." *Nasti v. CIBA Speciality Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citations omitted).  If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment.  *Reeves*, 530 U.S. at 146-48.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004).  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Under the Age Discrimination in Employment Act, it is unlawful for an employer to "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308-09 (5th Cir. 2004).  The ADEA makes it unlawful for an employee who is at least 40 years old to be subjected to an adverse employment action because of the employee's age.  *See Rutland v. Moore*, 54 F.3d 226, 228 (5th Cir. 1995) (citing 29 U.S.C. §§ 623(a), 631(a)).  "The same evidentiary procedure for allocating

33

burdens of production and proof applies to discrimination claims under both [Title VII and the ADEA]." *Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000); *see also Rachid*, 376 F.3d at 309 (ADEA); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (Title VII); *Sandstad v. CB Richard Ellis*, 309 F.3d 893, 896 (5th Cir. 2002) (ADEA).

### B.      Analysis

The TDPS does not dispute that Cyprow is a member of a protected class and "possessed at least the minimum qualifications necessary for the driver license technician position." (Docket Entry No. 21, at 17). Nor does the TDPS contest that Cyprow suffered adverse employment actions when she failed to receive promotions and when her employment was terminated. The TDPS argues that Cyprow cannot show that other similarly situated employees were treated more favorably.

Cyprow argues that Sergeant Torres and Captain Garza-Jennings treated her differently than other similarly situated employees outside her protected class. Cyprow points to Dora Taylor (African-American), Sergeant Turner (African-American), Sergeant Pulley (African-American), and Louisa Conte (Hispanic) as the relevant comparators. (Docket Entry No. 24, at 16). Cyprow argues that Dora Taylor, another driver's license technician, is similarly situated because Taylor had a poor customer service history and was placed on extended probation for unprofessional conduct, but was not terminated from her position at TDPS. In her affidavit, Cyprow asserts that Sergeant Pulley falsified records on administered road test checks and was not terminated but allowed to transfer offices. (Docket Entry No. 24, Ex. B, at ¶ 57). Cyprow asserts that Sergeant Turner was not terminated but instead was transferred after he was caught having sex in his office with another man. (*Id.*). Finally, Cyprow asserts that an unnamed female Hispanic employee, presumably Conte, was caught smoking marijuana and giving false employment information to a customer but was allowed

34

to resign instead of being terminated.  (*Id.*).

To establish the fourth element of the *prima facie* case, a plaintiff may present "circumstantial evidence that she has been treated differently than similarly situated non-members of the protected class." *Williams v. Trader Pub. Co.*, 218 F.3d 481, 484 (5th Cir. 2000) (citation omitted).  In disparate treatment cases involving employee misconduct and discipline, a "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (internal quotations omitted); *see also Berquist v. Wash. Mut. Bank*, No. 05-20956, 2007 WL 2007333, at *7 (5th Cir. Jul. 12, 2007) ("In disparate treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for the employees to be considered similarly situated.").  In determining whether circumstances are "nearly identical," the Fifth Circuit has noted that "the mere fact that two situations can be classified in the same broad category is a far cry from their being nearly identical." *Dodge v. Hertz Corp.*, 124 Fed. App'x 242, 244 (5th Cir. 2005) (unpublished opinion).  "[P]ut another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001).  Moreover, the "alleged comparator employees [must have been] similarly situated from the perspective of their employer at the time of the relevant employment decisions," *Perez v. Tex. Dept. of Criminal Justice*, 395 F.3d 206, 209 (5th Cir. 2004), and the comparator employees' position in the organization — e.g., job title, duties, supervisor — should be roughly the same.  *See*, *e.g.*, *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th

Cir. 2007).

Cyprow has failed to identify any support for an inference that Taylor or other TDPS employees were treated more favorably under "nearly identical circumstances." Although Taylor was a driver's license technician like Cyprow, she worked in a different department with a different supervisor. (Docket Entry No. 21, Ex. A, Deposition of Julie Cyprow, at 52:6–22; Ex. B, Deposition of Sergeant Torres, at 74:10–18). Taylor was disciplined for poor customer service but there is no showing that the discipline failed to improve her performance. In fact, Taylor did not receive any customer complaints while on extended probation. By contrast, even after disciplinary measures, repeated counselings, and serving an extended probation, Cyprow continued to receive customer complaints for rude and unprofessional behavior. Cyprow received seven customer complaints during her extended probation; Taylor received zero. (Docket Entry No. 21, Ex. C., Deposition of Norma Garza-Jennings, at 31:11–38:19). The change in Taylor's behavior after being placed on probation is a sufficient justification for the difference in treatment. (*Id.*). With respect to the other TDPS employees, the record does not show that they are similarly situated to Cyprow. Sergeant Pulley and Sergeant Turner were supervisors at the Gessner Office with different positions, titles, and job responsibilities than Cyprow, and they were disciplined for different conduct. The record does not contain evidence as to Louisa Conte's job title or the conduct for which she was disciplined. Even assuming that Conte was a driver's license technician and is the Hispanic female Cyprow referred to in her affidavit, she was not disciplined for poor customer service, but for drug use. The record does not show that younger, male, or minority driver's license technicians who repeatedly received customer and employee complaints for rude and unprofessional behavior, even after being placed on disciplinary probation, received a promotion or were not terminated.

Assuming that Cyprow had made a *prima facie* showing of discrimination in the decisions not to promote her and to terminate her employment, the TDPS has offered legitimate, nondiscriminatory reasons for its decisions.  The record shows that the decisions not to promote Cyprow were based on her poor customer service skills and poor performance during interviews.  The decision to terminate Cyprow's employment was based on numerous complaints from customers about her rude and unprofessional behavior, the inability to work well with her coworkers, and the violations of the extended disciplinary probation.  *See Mayberry*, 55 F.3d at 1090–91 (violations of an employer's "Code of Conduct" were legitimate grounds for termination).

As evidence of pretext, Cyprow asserts that Sergeant Torres solicited customers to "join in his anti-Cyprow campaign" by submitting complaints about Cyprow's customer service.  (Docket Entry No. 24, at 16).  According to Cyprow, Sergeant Torres "coerced" many of the customer complaints against her.  (Docket Entry No. 21, Ex. A, Deposition of Julie Cyprow, at 58:24–59:2).  Cyprow quotes a portion of Sergeant Torres's deposition testimony stating that he asked customers if they wanted to file a complaint against her.  (Docket Entry No. 24, at 14–15).

The deposition testimony of Sergeant Torres does not support an inference that he coerced or solicited customers to make complaints against Cyprow.  Torres testified as follows:

Q:    Did you ever recruit any complaints against her, ever ask anybody if they wanted to file a complaint against her?

A:    I didn't recruit any complaints.

Q:    Did you ever ask anyone if they wanted to file a complaint against Julie Cyprow?

A:    I sure did.

Q:    How many people did you ask if they wanted to file a complaint against Julie Cyprow?

37

> A:     I don't recall.  Normally, if a folk – a person comes over and states a particular employee was rude, my question is, okay, how is that person rude. If they give a reason or a way that the person was rude then [] I ask them do you want to file a complaint?  What is you want from this complaint?  I will ask anybody about any complaint on any employee.

(Docket Entry No. 21, Ex. B, Deposition of Sergeant Torres, at 68:10–25).  Sergeant Torres testified that he did not solicit complaints.  Sergeant Torres asked customers if they wanted to file a complaint against Cyprow only *after* they complained of her rude and unprofessional behavior. Asking unsatisfied customers whether they want to file a complaint is consistent with the role of a supervisor in an office where customer service is important.  It was Sergeant Torres's responsibility to ensure that the driver's license technicians he supervised were providing satisfactory customer service and that members of the public were satisfied with the service they received.  Asking a customer who has verbally complained about poor service if they would like to formalize that complaint in writing is not "coercing" or "recruiting" customer complaints.

Cyprow also relies on the affidavit of Patricia Moreno, an administrative technician at the Gessner Office from September 2002 through October 2006.  (Docket Entry No. 24, Ex. A, Affidavit of Patricia Moreno, at ¶¶ 2–3).  In her affidavit, Moreno stated that Cyprow was "a friend of mine at work" and "was not prejudiced or rude to minorities during any encounter which I ever witnessed."  (*Id.*, at ¶¶ 9–10).  Moreno stated that Sergeant Torres invited her on several occasions to accompany him to the homes of customers who had been serviced by Cyprow.  (*Id.* at ¶¶ 13–14). According to Moreno, Sergeant Torres told the customers that Cyprow "was a very prejudiced Anglo woman, prejudiced against Hispanics and shouldn't be permitted to work" at the TDPS.  (*Id.*, at ¶ 14).  Moreno stated that Sergeant Torres instructed the customers to "write down what they had discussed and to include that she was prejudiced and very rude."  (*Id.*).  According to Moreno, some

38

customers would hand the document to Sergeant Torres, who "would go over it and approve it, or would make a suggestion on what it should say." (*Id.*).  Moreno, a notary public, notarized these customer complaints against Cyprow, at Sergeant Torres's request.  (*Id.*, at ¶ 15).  Moreno stated that on one occasion, Sergeant Torres told a Hispanic customer that Cyprow did not "deserve or 'need to be working where she was because she was a very prejudice employee against minorities' and that he need[ed] her help to get Mrs. Cyprow out of there, even if it was by filing a complaint against her." (*Id.*, at ¶ 17).  Moreno stated that she "felt very uncomfortable hearing all of this, but [she] kept [her] mouth shut." (*Id.*, at ¶ 14).

Moreno's affidavit is insufficient, in light of the considerable evidence of Cyprow's violations of workplace policy and of the terms of her disciplinary probation, to raise a fact issue as to whether the TDPS's asserted reasons for Cyprow's termination were a pretext for discrimination. The only customer complaints in the record notarized by Moreno were written on May 7, 2004 by Gerardo and Magnelly Ortega.  Taking the summary judgment evidence in the light most favorable to Cyprow and assuming that the May 7, 2004 complaints by the Ortegas were "coerced" or "recruited," the record does not support an inference that the remainder of the complaints against Cyprow were coerced or recruited and that the TDPS's decisions based on those complaints was a pretext for discrimination.  Moreover, the customer and coworker complaints about Cyprow's service and behavior began long before Sergeant Torres became Cyprow's supervisor.  Those complaints continued after February 2004, when Torres became the supervisor, but he did not field all the complaints.  Some customer complaints were made in anonymous phone calls or through the "Thought Bubble" complaint process.

The record also shows that some of the written complaints about Cyprow were first made

to Sergeant Torres verbally after he came to Cyprow's workstation to diffuse a confrontation between Cyprow and a customer. The customer would complain about Cyprow's behavior and was then given the opportunity to file a written complaint at the Gessner Office. The decision to terminate Cyprow's employment was made based on numerous complaints by both customers and coworkers that were reported in different ways, investigations conducted by Captain Garza-Jennings and Sergeant Perkins-Lee, as well as determinations by Cyprow's superiors that she had failed to follow the terms of her disciplinary probation and failed to modify her behavior despite having been given several opportunities to do so.

Moreno's testimony supports an inference that Sergeant Torres had a personal dislike for Cyprow. But "personal animosity among people who happen to be of different races . . . is not a violation of the various civil rights statutes." *See Jones v. Yonkers Public Schools*, 326 F.Supp.3d 536, 546 (S.D.N.Y. 2004) (citing *Graziano v. N.Y. State Police*, 198 F.Supp.2d 570, 578 (S.D.N.Y. 2002) (noting that the plaintiff "may (or may not) have been the unfortunate target of a conspiracy of his fellow employees who didn't like him" and "however malicious or contemptible such conduct might be, if it was not gender-motivated, it would not give rise to an action against their employer under Title VII . . . ."); *see also Grimes v. Texas Dep't of Mental Health & Retardation*, 102 F.3d 137, 143 (5th Cir. 1996) ("[E]vidence of mere dislike is not enough to prove pretext under Title VII; [plaintiff] must present evidence which would support an inference of racial or retaliatory animus in order to meet her evidentiary burden under a Title VII discrimination or retaliation claim."). There is no evidence of race, color, age, or sex-based animus on the part of Sergeant Torres or any other TDPS supervisor. The evidence in the record does not support an inference that the decision to terminate Cyprow's employment was motivated by her race, color, age, or sex.    Moreover,

Moreno's affidavit does not raise a fact issue as to whether the decisions not to promote Cyprow were a pretext for discrimination. Those decisions were made by an independent board. Every time Cyprow applied for a promotion, the application went to a board made up of different individuals, none of whom was within Cyprow's chain of command. (Docket Entry No. 21, Ex. A, Deposition of Julie Cyprow, at 67:2–25). There is no evidence that Sergeant Torres or Captain Garza-Jennings influenced or tainted the board's decisions on promotions. (*Id.*, at 68:12–15). Cyprow testified that the board decided not to promote her because of her history of customer complaints and because she scored low on her interviews. (*Id.*, at 65:13–19). The evidence in the record does not raise a fact issue material to determining whether the TDPS's asserted reasons for Cyprow's non-promotion and termination were a pretext for discrimination.

Summary judgment is granted on Cyprow's claims of discrimination based on disparate treatment.

## V.    The Retaliation Claims

In the complaint, Cyprow alleged that the TDPS retaliated against her after she wrote Lieutenant Blunt a letter on May 11, 2004 to complain about Sergeant Torres's discriminatory actions with respect to vacation time and after she wrote Sergeant Torres a letter on May 17, 2004 asserting that she had suffered discrimination in the workplace. (Docket Entry No. 1). Cyprow alleged that the retaliation was "false write ups and a witch hunt." (*Id.*, Ex. A). Cyprow alleged that the investigation conducted by Garza-Jennings, the complaints by Dora Taylor and Urshula Jones, and customer complaints received by Sergeant Torres were all retaliation for her complaints of discrimination. Cyprow asserts that Sergeant Torres "went on a search and destroy mission to get [her] fired." (Docket Entry No. 24, at 17). Cyprow also alleged that the denials of promotions

41

were in retaliation for her complaints on May 11 and May 17, 2004.

A.    The Legal Standard

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir.2007); *Septimus v. Univ. of Houston*, 399 F.3d 601, 607-10 (5th Cir. 2005). ADEA retaliation claims are analyzed under this framework. *See Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 267 (5th Cir. 1994) (outlining the prima facie retaliation case in ADEA cases, which is the same as in Title VII cases). Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation, which requires a showing that: (1) the plaintiff engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *McCoy*, 492 F.3d at 556–57. The Supreme Court recently clarified in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), that for the purpose of a retaliation claim, an "adverse employment action" is defined as an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations omitted). If a plaintiff makes a *prima facie* showing of retaliation, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. *McCoy*, 492 F.3d at 557. If

the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof at the pretext stage requires the plaintiff to show that the adverse employment action would not have occurred but for her protected conduct. *Septimus*, 399 F.3d at 607; *Pineda v. United Parcel Serv.*, *Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

####      B.      Analysis

Cyprow engaged in protected activity by complaining about discrimination to her superiors in May 2004 and by filing an EEOC charge in June 2004. *See Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995) ("[F]iling an administrative complaint is clearly protected activity."). Job termination and the denial of a promotion are adverse employment actions in the retaliation context. *See Richard v. Cingular Wireless LLC*, 2007 WL 1121720, *4 (5th Cir.2007) (termination); *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (denial of a promotion). It is unclear, however, whether the coworker and customer complaints allegedly solicited by Sergeant Torres, and the resulting "write-ups" or disciplinary measures, are adverse employment actions. *See Grice v. FMC Techs. Inc.*, 216 Fed. App'x 401, 404 (5th Cir. 2007) (holding that an adverse employment action did not occur when the employer (1) watched the plaintiff closely, (2) accused the plaintiff of forgery, (3) falsified an incident report to place blame on the plaintiff, and (4) did not allow the plaintiff to be a step-up lead in the absence of the Lead Assembler); *Pittman v.  General Nutrition Corp.*, 515 F.Supp.2d 721, 744 (S.D. Tex.  2007) (finding that a fact issue existed as to whether negative performance evaluations and/or "write-ups" were materially adverse employment actions in the retaliation context).  Even assuming that the customer and coworker complaints against Cyprow and the allegedly false write-ups were adverse employment actions, the record does not

support a conclusion that there was a causal link between these complaints and write-ups and Cyprow's complaints of discrimination by Sergeant Torres.  "[I]n order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). The record shows that Cyprow's supervisors did not have knowledge of her discrimination complaint until May 14, 2004 at the earliest, when Lieutenant Blunt received the May 11, 2004 letter.  Taylor and Jones filled out their complaints against Cyprow on May 5, 2004.  The Ortegas' written complaints were filled out on May 7, 2004.  Sergeant Torres forwarded these complaints to the Employee Relations Office on May 12, 2004, two days before anyone at the TDPS knew of Cyprow's discrimination complaint against Sergeant Torres.  The undisputed facts show that as a matter of law there is no causal link between Cyprow's May 14 and May 17 complaints of discrimination and the complaints that led to the May 13, 2004 investigation by Captain Garza-Jennings.

With respect to the job termination, the TDPS argues that Cyprow cannot establish a causal link between Cyprow's filing of complaints against Torres in 2004 and the decision to terminate Cyprow's employment in 2006.  The causal link required by the third prong does not rise to the level of a "but for" standard at the *prima facie* case stage.  *Gee*, 289 F.3d at 345.  A "causal link" may be shown by evidence that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001).  "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).  The Supreme Court has noted

44

that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001).  The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.  *See*, *e.g.*, *Bell v. Bank of Am.*, 171 Fed. App'x 442, 444 (5th Cir. 2006) (holding that a seven-month lapse, by itself, does not support establish a causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month lapse, by itself, does not support an inference of a causal link)*; Harvey v. Stringer*, 113 Fed. App'x 629, 631 (5th Cir. 2004) (finding that a ten-month lapse, by itself, did not create a causal link); *Stroud v. BMC Software*, *Inc.*, 2008 WL 2325639, at *6 (5th Cir. Jun. 6, 2008) (finding that a three-week lapse between protected activity and adverse employment action was sufficient to establish causal link); *Richard v. Cingular Wireless LLC*, 233 Fed.Appx. 334, 338 (5th Cir. 2007) (concluding that two and one half months is a short enough time period to support an inference of a causal link);*Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a period of less than sixty days was sufficiently close to establish causal link for *prima facie* case of retaliation); *Ware v. CLECO Power LLC*, 90 Fed. App'x 705, 708 (5th Cir. 2004) (finding a fifteen-day lapse sufficiently close to support an inference of causation); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes") (internal citations omitted).

In the present case, there is insufficient temporal proximity to support an inference of a causal link between Cyprow's complaints of discrimination and the decision to terminate her employment.  Cyprow was fired in July 2006, over two years after she complained of discrimination.

45

The customer and coworker complaints forming the basis for the progressive and discipline and ultimate termination began before Cyprow's complaints of discrimination and continued after she made her internal complaints and filed her EEOC charge.  There is no basis to conclude that the decision to fire Cyprow was based in part on her complaints of discrimination.

Cyprow has also alleged that she was denied promotions in retaliation for her complaints of discrimination.  The record is unclear as to precisely when Cyprow applied for promotions, but the fact that she applied for promotions more than eight times while she worked at the TDPS means that it is possible she was denied a promotion within a few months of her complaints against Sergeant Torres in May and June 2004.  Assuming that Cyprow has made a *prima facie* showing of retaliatory denial of promotions, and even assuming that she made a *prima facie* showing of retaliation in the decision to fire her, the TDPS has presented legitimate nonretaliatory reasons for the promotion denials and the job termination.  The record does not raise a disputed fact issue material to determining whether the reasons for the termination or denials of promotions were a pretext for retaliation.

To raise a fact issue as to pretext, Cyprow must identify or present evidence that she would not have been terminated, or that she would not have been denied promotions, "but for" her discrimination complaint against Sergeant Torres.  *See Ameen v. Merck & Co., Inc.*, 226 Fed. App'x 363, 377 (5th Cir. 2007).  As evidence of pretext, Cyprow relies on Moreno's affidavit.  Moreno "recalls [Sergeant Torres's] grooming and venal rhetoric to the people who he solicited, contrary to his sworn testimony to join in his anti-Cyprow campaign." (Docket Entry No. 24, at 16).  Cyprow argues that "[t]he timing of [Sergeant Torres's] May 13, 2004 complaint against Plaintiff is more than suggestive of motive."  (*Id.*, at 17).   But the evidence in the record shows that Cyprow had

long-standing performance and discipline problems beginning before any of her discrimination complaints. She was given multiple opportunities to improve those problems but failed to do so. Cyprow continued to receive warnings and escalating disciplinary measures under the progressive discipline program, resulting in extended disciplinary probation and ultimately termination for violating the probation terms. Cyprow had several different supervisors who disciplined her for the same types of misconduct and performance problems, both before and after her complaints against Sergeant Torres and other supervisors. Cyprow was denied promotions both before and after her discrimination complaints, each time based on her poor customer service and low interview scores. The decisions not to promote Cyprow were made by an independent board, many of whom were not even aware of Cyprow's discrimination complaints. The reasons for the decisions made after Cyprow's complaints are consistent with the reasons for the decisions made before Cyprow's complaints. Given Cyprow's performance and disciplinary history, there is no basis to conclude that TDPS decided to terminate Cyprow's employment or deny her promotions in retaliation for her filing an internal discrimination complaint or EEOC charge. The TDPS's motion for summary judgment on Cyprow's retaliation claim is granted.

## VI. The Civil Conspiracy Claim

Civil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, is a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968). To prevail on her claim of civil conspiracy under Texas law, Cyprow must show that the defendants are liable for an underlying tort. *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir.2007). Because this court grants

summary judgment on Cyprow's discrimination claims, there is nothing on which to base the conspiracy claim. Summary judgment is granted as to Cyprow's civil conspiracy claim.

## VII.    Conclusion

As a state agency, the TDPS is immune from Cyprow's claims for money damages under § 1981, § 1983, and the ADEA. To the extent that Cyprow seeks prospective injunctive relief in the form of a reinstatement order, her § 1981, § 1983, and ADEA claims against Torres and Garza-Jennings in their official capacities are not barred by Eleventh Amendment Immunity. To the extent that Cyprow has sued Torres and Garza-Jennings in their individual capacities, they are entitled to qualified immunity from the § 1981 and § 1983 claims, and they are not liable under Title VII or the ADEA because they were not Cyprow's employer. Cyprow's Title VII and ADEA claims against the TDPS for discrimination based on her race, color, age, and sex, as well as Cyprow's civil conspiracy claim, fail as a matter of law. The defendants' motion for summary judgment is granted. Final judgment is entered by separate order.

SIGNED on June 17, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge